| | |
|---|---|
| **ALEXIS DOUGHERTY, DENNIS CALABRESE, LILY NICOLE PORTEE, JESSIE RUIZ-JACOBS, PETER BUNGERT, CHRISTIE STARNES, KASSANDRA BLANKENSHIP, JAMES HIGGINS, and LEONARDO YON,** on behalf of themselves all others similarly situated, | Case No. Case No. 3:25-cv-00065-KDB-DCK |
| **Plaintiffs,** | CLASS ACTION |
| **v.** | |
| **BOJANGLES' RESTAURANTS, INC.,** | |
| **Defendant.** | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BOJANGLES' RESTAURANTS, INC.'S MOTION TO DISMIS**

## I.    INTRODUCTION

When Plaintiffs applied for employment with Bojangles' Restaurants, Inc. ("Bojangles"), they had no idea their relationship with Bojangles would come back to haunt them. As a term of employment, Bojangles required Plaintiffs to provide it with their personally identifiable information ("PII") and protected health information ("PHI") (together "Private Information"), including their names, addresses, Social Security numbers, driver's license numbers, passport numbers, state ID numbers, financial information, financial account numbers, credit card numbers, debit card numbers, health insurance information, and medical information. Yet, Bojangles failed to adequately secure that information on its systems or to delete the information of former employees. These inadequacies became apparent in February 2024, when Bojangles' network was hacked and its files containing employees' Private Information were viewed and downloaded by

cybercriminals. Worryingly, a notorious ransomware gang, "Hunters," claimed ownership of the attack and publicly posted that it had exfiltrated almost 300 Gigabytes of data with a link to view the stolen information on its dark web site. Because Bojangles failed to implement adequate cybersecurity protocols to protect its current and former employees' Private Information that it maintained, Plaintiffs and the putative class are now at substantial risk of identity theft and fraud.

Despite the breach occurring between February 19, 2024 and March 12, 2024, Bojangles did not begin notifying victims until November 19, 2024– approximately nine months after the Data Breach began. By then, it was too late. Plaintiffs' information had been taken from Bojangles' network and disclosed to unauthorized third parties. Plaintiffs have already suffered from the impacts of the Data Breach, including fraudulent charges and increased spam and phishing calls. Plaintiffs have spent and will continue to spend considerable time and effort monitoring their accounts to protect themselves from identity theft and other misuse of their Private Information, which is a lifetime risk now that their Private Information has been unlawfully disclosed.

Plaintiffs sued Bojangles on behalf of themselves and the putative class alleging the following claims: (i) negligence, (ii) negligence *per se,* (iii) breach of implied contract, (iv) invasion of privacy, (iv) unjust enrichment, (v) breach of fiduciary duty, (vi) Violation of North Carolina Unfair and Deceptive Trade Practices Act, and (vii) declaratory judgment. In bringing these allegations and claims, Plaintiffs have met their pleading burden and the Court should deny Bojangles' motion to dismiss for two reasons: *first,* Plaintiffs have suffered harm from Bojangles' data breach—harm that establishes his standing to sue Bojangles and claim damages; and *second,* Plaintiffs allege all elements necessary to plead their claims.

II.     **FACTS**

    A. **Bojangles Collects and Promises to Safeguard Plaintiffs' Private Information**

Bojangles is a fast-food chain that owns and operates over 800 locations throughout the United States. Doc. No. 1 ("Compl.") ¶21. Thus, Bojangles employs thousands of employees, and each employee must submit certain Private Information—including but not limited to names, addresses, Social Security Numbers, driver's license information, passport information, government issued ID numbers, state ID numbers, financial information (including debit and credit card numbers and financial account numbers), health insurance information, and medical information—to Bojangles to receive and facilitate employment. *Id*. ¶¶22, 28. Bojangles then stores and maintains that Private Information for years, without implementing reasonable cybersecurity safeguards or protocols, long after an employee leaves Bojangles' employment. *Id*. ¶¶5, 33, 183. When it collects and maintains that Private Information, Bojangles recognizes it has a duty to safeguard it and keep it confidential, agreeing to protect the data using reasonable means. *Id*. ¶¶23, 25. Plaintiffs trusted Bojangles would reasonably protect their Private Information, which they would not have provided to Bojangles if they knew Bojangles would not implement the necessary precautions to secure it. *Id*. ¶¶243, 279. In fact, Bojangles did not follow industry standards in securing the Private Information it maintained or in training its IT or data security employees to prevent, detect, and stop breaches of Bojangles' systems. *Id*. ¶¶183-187. As a result, Bojangles left its current and former employees' Private Information an unguarded target for criminals. *Id*. ¶187.

### B. Bojangles Violates its Duties

Between February 19, 2024, and March 12, 2024, Bojangles' systems were hacked, and its employees' Private Information was accessed and downloaded by unauthorized actors. *Id*. ¶¶26-27. Bojangles knew by March 12, 2024 that files containing Private Information were viewed and downloaded because of the breach. *Id*. However, Bojangles' failed to notify its current and former

employees of the breach until November 19, 2024—almost nine months after the breach began. *Id*. ¶30. The PII impacted included, at a minimum, names, addresses, Social Security numbers, driver's license numbers, passport numbers, state ID numbers, financial information, financial account numbers, credit card numbers, debit card numbers, health insurance information, and medical information. *Id*. ¶2. Bojangles' delay in notifying victims made its current and former employees more vulnerable to identity theft as they did not know to guard themselves by monitoring their accounts or credit reports to prevent misuse of their PII. *Id*. ¶¶30, 173, 247.

**C. Plaintiffs Suffer Harm Following Bojangles' Data Breach**

Plaintiffs have suffered, and will continue to suffer, harm following the data breach. *Id*. ¶¶165, 220. Plaintiffs suffered from the exposure of their PII, as evidenced by cybercriminal group "Hunters" posting a link to the 387,025 files it stole from Bojangles. *Id*. ¶¶37-38. Additionally, Plaintiffs have already experienced a variety of instances of fraud following the Data Breach. For example, in February 2024, Plaintiff Ruiz-Jacobs suffered from fraudulent charges on his debit card, totaling $80. *Id*. ¶98. And, Plaintiffs Dougherty, Portee, Starnes, and Blankenship all experienced an increase in spam and scam phone calls that began shortly after the Data Breach, further suggesting that their PII is in the hands of cybercriminals. *Id*. ¶¶51, 81, 122, 140. Plaintiffs have spent and will continue to spend considerable time and effort monitoring their accounts to guard themselves against the present and continuing threat that Bojangles' Data Breach poses. *Id*. ¶¶50, 66, 80, 96, 106, 121, 139, 151, 160. Indeed, Plaintiffs have already spent time verifying the legitimacy of the Notice of Data Breach, investigating the Data Breach, researching how best to ensure they are protected from its consequences, and reviewing their financial account statements. *Id*. For example, Plaintiff Higgins has spent multiple hours taking steps to freeze and close his credit accounts and Plaintiff Bungert has spent at least 50 hours monitoring his accounts since the

Breach occurred. *Id*. ¶¶106, 151. As a result of the Data Breach, Plaintiffs not only suffer from an imminent risk of identity theft, but have also suffered a decrease in value of their PII. *Id*. ¶165.

## III. ARGUMENT

### A. Legal Standard

Under Rule 12(b)(1), a defendant may challenge subject-matter jurisdiction by contending, as Defendant does here, "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). Thus, the plaintiff is "afforded the same procedural protection as she would receive under a Rule 12(b)(6) consideration," where "the court construes the allegations of the complaint in the light most favorable to the plaintiff, and all well-pleaded facts and allegations in the complaint are accepted as true." *Oppenheimer v. Morgan*, No. 1:19-cv-00002-MR, 2019 U.S. Dist. LEXIS 106944, at *2 (W.D.N.C. June 26, 2019); *Kerns*, 585 F.3d at 192 (same).

### B. Plaintiffs Have Article III Standing.

The notorious Hunters cybergang hacked into Defendant's computer systems and stole nearly 400,000 files containing Plaintiffs' most sensitive data—names, addresses, Social Security numbers, credit and debit card numbers, financial account numbers and information, health insurance information, and medical records. Compl. ¶¶ 26–28, 37. Then, Hunters posted about the Data Breach on its dark web leak page, indicating the PII/PHI it stole would become available to view. *Id.* ¶ 38. Accordingly, Plaintiffs allege their "stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web." *Id.* ¶ 40. That Hunters carried out the Data Breach "with the intent to steal private information" and did in fact "st[eal], access[], and use[]" Plaintiffs' PII/PHI establishes Plaintiffs' Article III standing in line with Fourth Circuit precedent. *See Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 622 (4th Cir.

2018). Plaintiffs sufficiently allege concrete injuries traceable to Defendant's Data Breach to establish their Article III standing.

**1. When Standing Is Plausibly Alleged, a Motion to Dismiss Must Be Denied.**

To establish standing under Article III, Plaintiffs must show (i) an "injury in fact" that is concrete and particularized, (ii) the injury is "fairly traceable" to the defendant's challenged conduct, and (iii) the injury is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs here plausibly allege each element of Article III standing, including the injury-in-fact and traceability elements Defendant challenges.

**2. All Plaintiffs Allege Concrete Injuries-In-Fact Through the Targeting and Misuse of Their PII/PHI.**

Under Fourth Circuit precedent in data breach cases, "misuse or targeting of personal information by hackers, alone" can establish injury-in-fact. *McCreary v. Filters Fast LLC*, 2021 WL 3044228, at *4 (W.D.N.C. July 19, 2021) (citing *Hutton*, 892 F.3d at 622). Plaintiffs allege specifically that here: a notorious hacker group targeted, stole, and misused (or will imminently misuse) their PII/PHI by publishing it on the dark web. Compl. ¶¶ 26–28, 37–40. Accordingly, Plaintiffs allege far more than a "mere potential compromise of personal information." *See Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (holding increased risk of future identity theft too speculative where there was no indication "the data thief intentionally targeted the personal information compromised in the data breaches," or that plaintiffs' data had been misused). Rather, Plaintiffs' allegations are more like *Hutton*, where the Fourth Circuit held allegations that plaintiffs' data "has been stolen, accessed, and used in a fraudulent manner" establish an imminent threat of injury to satisfy Article III standing. *Hutton*, 892 F.3d at 622.

First, Plaintiffs allege Hunters targeted and hacked Defendant's systems, took 387,025 files containing PII/PHI, and posted about the Data Breach on its dark web page. Compl. ¶¶ 26–28, 37–

6

40, 157. Accordingly, they allege Hunters targeted and stole their PII/PHI intending to misuse it, establishing injury-in-fact under Fourth Circuit precedent. *See, e.g. Farley v. Eye Care Leaders Holdings, LLC*, 2023 WL 1353558, at *3 (M.D.N.C. Jan. 31, 2023) (injury-in-fact established where "thieves here targeted personal information in a series of massive and deliberate acts, giving rise to an easy inference that the thieves intended to misuse the personal information they stole"); *Solomon v. ECL Grp., LLC*, 2023 WL 1359662, at *3 (M.D.N.C. Jan. 31, 2023) (injury-in-fact established where plaintiff "alleged that thieves targeted and stole personal information to misuse it"); *Bank of Louisiana v. Marriott Int'l, Inc*., 438 F. Supp. 3d 433, 440 (D. Md. 2020) (plaintiff established "an imminent future threat of fraudulent activity that put it far outside the insufficient standing allegations in *Beck*" where defendant's system "was compromised with the specific intent to steal" personal data). Indeed, "there is no need for speculation where Plaintiffs allege that their data has already been stolen and is now in the hands of ill-intentioned criminals." *Beck*, 848 F.3d at 273 (quotations and alterations omitted) (citation omitted).

Further, Plaintiffs establish concrete injuries-in-fact through the actual misuse of their PII/PHI because they allege Hunters has published or will imminently publish the stolen data on the dark web. Compl. ¶ 38–40. *See McCreary*, 2021 WL 3044228, at *5 (allegations that plaintiffs' data was targeted, stolen, and published on the dark web establish "*actual* misuse of their personal information" and concrete injuries); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 459 (D. Md. 2020) (complaint alleging misuse or intentional targeting of personal information by hackers "bring[s] the actual and threatened harm out of the realm of speculation and into the realm of sufficiently imminent and particularized harm to satisfy the injury-in-fact requirement" for standing). Notably, Plaintiff Ruiz-Jacobs alleges that he experienced fraudulent charges on his debit card in February 2024 totaling approximately $80.

Compl. ¶ 98. Additionally, Plaintiffs Dougherty, Portee, Starnes, and Blankenship allege they experienced spam and scam phone calls using their PII following the Data Breach. *Id.* ¶¶ 51, 81, 122, 140. This also establishes also misuse of these Plaintiffs' PII/PHI and their concrete injuries in fact. *See Capiau v. Ascendum Mach., Inc.*, 2024 WL 3747191, at *4 (W.D.N.C. Aug. 9, 2024) ("Capiau's receipt of spam . . . does show that his PII is being used in a fraudulent manner due to the Ascendum breach. Based on this credible showing of actual misuse, the Court concludes that Capiau has established a concrete and actual injury sufficient to confer Article III standing."); *Solomon*, 2023 WL 1359662, at *4 (injury-in-fact established based on misuse of PII in the form of "an increase in spam texts, spam calls, and spam emails").

### 3. Defendant Is Wrong to Claim Future Harm Cannot Confer Standing.

Defendant argues, "A concrete injury for standing purposes does not exist until that identity theft, fraud, or other material harm actually occurs." Mot. at 8. That is simply wrong. The Supreme Court has held that even intangible injuries like the threat of future harm may be concrete. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotations omitted). Thus, cognizable injuries include a substantial risk that the harm will occur, even if it is not "literally certain." *Clapper v. Amnesty Int'l, Inc.*, 568 U.S. 398, 414 n.5 (2013).

Accordingly, Plaintiffs sufficiently plead standing based on an imminent risk of identity theft here, given the targeted theft of their PII/PHI and its misuse via dark web publication. Compl. ¶¶ 26–28, 37–40; *see Bank of Louisiana*, 438 F. Supp. 3d at 440 (plaintiff establishes injury-in-fact through "an imminent future threat of fraudulent activity" where defendant's system "was compromised with the specific intent to steal" personal data); *compare with Podroykin v. Am.*

*Armed Forces Mut. Aid Assoc.*, 634 F. Supp. 3d 265, 270 (E.D. Va. Oct. 11, 2022) (finding no injury-in-fact based on substantial risk of harm where there are no allegations the "plaintiff's PII was the target of the [ransomware] attack"). The Court should disregard Defendant's inaccurate red-herring argument on this point.

**4. Plaintiff Ruiz-Jacobs's Fraudulent Charges Are Traceable to the Data Breach.**

The second prong of Article III standing requires that pleaded injuries are "fairly traceable" to Defendant's conduct. *Lujan*, 504 U.S. at 560. Importantly, "traceability 'does not mean plaintiffs must show to a scientific certainty that defendant's effluent caused the precise harm suffered by the plaintiffs.'" *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). In other words, "the 'fairly traceable' standard is 'not equivalent to a requirement of tort causation.'" *Id.* at 161.

The fraudulent charges to Plaintiff Ruiz-Jacobs's debit card are fairly traceable to the Data Breach. In arguing otherwise, Defendant disregards the Complaint's allegation that the PII/PHI stolen in the Data Breach includes "financial information; financial account numbers; credit card numbers; and debit card numbers." Compl. ¶ 28.[1] Defendant similarly ignores Plaintiffs' allegations regarding "Fullz" packages—dossiers criminals compile by cross-referencing multiple sources of data about an individual—by which, "even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach," criminals can still misuse the stolen data to commit this shade of identity theft against Plaintiff Ruiz-Jacobs. *Id.* ¶¶ 169–70.

Taking these allegations as true and weighing them in Plaintiff Ruiz-Jacob's favor as

---

[1] Plaintiff Ruiz-Jacobs also alleges, specifically to himself, that he provided Defendant "with his sensitive PII, *including* his Social Security number"—not *only* his Social Security number, as Defendant now attempts to frame it. Compl. ¶ 90 (emphasis added).

required, *Wikimedia Found.*, 857 F.3d at 208, it is certainly plausible that his PII/PHI taken in the Data Breach was misused in connection with the fraudulent charges he experienced around the time the Data Breach occurred. In *In re Marriott*, traceability was established based on the plaintiffs' allegations that, analogous to here, they provided their PII to Marriott, Marriott was the target of a data breach, and as a result, plaintiffs' PII was misused to open or apply for fraudulent accounts. 440 F. Supp. 3d at 467. Just as in *In re Marriott*, Plaintiff Ruiz-Jacobs's allegations that he provided his PII to Defendant, Hunters stole that PII, and the PII was misused to make fraudulent charges to his debit card establish injuries that are traceable to Defendant's Data Breach. "Put simply, the amount of information taken 'gave hackers the means to commit fraud or identity theft.'" *Bass v. Facebook, Inc*., 394 F. Supp. 3d 1024, 1034 (N.D. Cal. 2019) (financial fraud fairly traceable to data breach that exposed names, dates of birth, and Social Security numbers) (citation omitted); *In re Zappos.com, Inc.*, 888 F.3d at 1027–29 (unauthorized access to plaintiffs' accounts fairly traceable to data breach where "hackers accessed information that could be used to help commit identity fraud or identity theft."); *Lewert*, 819 F.3d at 969 (unauthorized charges fairly traceable to data breach).

### 5. Plaintiffs' Mitigation Efforts Are an Injury-in-Fact.

Because of the substantial harm Plaintiffs now face, the time they were required to spend mitigating the risk of that harm confers standing as well. Despite the evidence of a targeted attack by a criminal actor, and the exfiltration of the type of PII that leads directly to identity theft, Defendant now claims that Plaintiffs' mitigation efforts were unwarranted, contending that Plaintiffs' allegations are "nothing more than an attempt to manufacture standing." Mot. at 8.[2] Yet

---

[2] Defendant's argument appears to stem from its earlier argument that because Plaintiffs have not yet suffered misuse of their PII, they are not at a substantial risk of future harm—and, as a result, their mitigation efforts are too speculative. Defendant is misguided. *Betz v. St. Joseph's/Candler*

as outlined above, Plaintiffs have plausibly alleged that they are at a substantial risk of future harm, so courts across the country have held that mitigation efforts are not speculative and thus confer standing. *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc*., 892 F.3d 613, 622 (4th Cir. 2018); *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 389 (6th Cir. 2016) ("This is not a case where Plaintiffs seek to 'manufacture standing by incurring costs in anticipation of non-imminent harm.' Rather, these costs are a concrete injury suffered to mitigate an imminent harm, and satisfy the injury requirement of Article III standing."); *Florence v. Ord. Express, Inc.*, 674 F. Supp. 3d 472, 482 (N.D. Ill. 2023).

Moreover—and contrary to Defendant's argument—Plaintiffs have also alleged that they have already been required to spend time and effort on mitigation. Although Defendant singles out Plaintiff Higgin's allegation that he "anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach," Mot. at 8 (citing Compl. ¶ 153), Defendant simply ignores that he—like the other Plaintiffs—also alleged that they have *already* taken steps to avoid identity theft, "including closely tracking his credit monitoring service, freezing and closing his accounts and carefully reviewing all his accounts." Compl. ¶ 151. Because these efforts were taken to address the actual harm and substantial risk of harm caused by Defendant, Plaintiffs' mitigation efforts are a concrete harm for standing purposes. *See e.g.*, *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 749 (S.D.N.Y. 2017) ("[M]itigation expenses satisfy the injury requirements of negligence; otherwise Plaintiffs would face an untenable Catch–

---

*Health Sys., Inc.*, 630 F. Supp. 3d 734, 752 n.3. (D.S.C. 2022); *Stamat v. Grandizio Wilkins Little & Matthews, LLP*, 2022 WL 3919685, at *6 (D. Md. Aug. 31, 2022) ("Actual misuse of data, however, is not strictly required to establish standing in the data breach context."). As one District Court concisely put it, "[h]aving one's social security number stolen seems an obvious harm. If it were not a harm, why should [Defendant] (or anyone else) take any data security measures? [Defendant] might as well leave its customer lists in a spreadsheet on its website." *Krupa v. TIC Int'l Corp.*, 2023 WL 143140, at *2 (S.D. Ind. Jan. 10, 2023).

22" because "Plaintiffs were required to take reasonable steps to mitigate the consequences of the data breach; they could not passively wait for their identities and money to be stolen.").[3]

### 6. Diminution in Value of Private Information Is an Injury-In-Fact.

Plaintiffs have plausibly alleged that their Private Information is a valuable property right that has been diminished by the Data Breach. To begin, Defendant complains that Plaintiffs fail to provide "any factual assertions about the value of their personal information." Mot. at 8. But this is simply false—for example, Plaintiffs allege that "[s]tolen PII/PHI is one of the most valuable commodities on the criminal information black market," and that depending on the type of information stolen, it can be worth "up to $1,000.00." Compl. ¶¶ 166, 167. As for Defendant's argument that Plaintiffs' Private Information did not become less valuable as a result of the breach, as one Maryland District Court explained in the context of data breach litigation, "the growing trend across courts that have considered this issue is to recognize the lost property value of this information." *In re Marriott*, 440 F. Supp. 3d at 461. Courts have begun to recognize that "[t]he value of personal information in the digital world is fundamentally different from what might be considered a loss of value in a 'typical' market. The Data Breach devalued Plaintiffs' PII by interfering with their fiscal autonomy." *In re Eureka Casino Breach Litig.*, 2024 WL 4253198, at *5 (D. Nev. Sept. 19, 2024). Despite Defendant's protests, Plaintiffs need not literally "reduce their . . . PII to terms of dollars and cents in some fictitious marketplace where they offer such information for sale to the highest bidder.*" In re Mednax Servs., Inc., Customer Data Sec. Breach*

---

[3] Defendant also attempts to argue that Plaintiffs failed to allege that they have suffered or will suffer imminent harm, in part because the Data Breach "occurred over a year ago." Def's. Mem. at 8. Again, Defendant ignores the Complaint. As Plaintiffs alleged, "it can take victims years to discover such identity theft and fraud." Compl. ¶ 167. Defendant, in effect, asks the Court to draw the inference that because Plaintiffs have not yet experienced identity theft after a year, the risk is not substantial. Not only does this argument ignore the allegations in the Complaint, but it inappropriately would have the Court take the facts in the light most favorable to *Defendant*.

*Litig.*, 603 F. Supp. 3d 1183, 1204 (S.D. Fla. 2022) (collecting cases). Instead, it is sufficient for Plaintiffs to "allege details about the existence of an economic market for selling stolen PII, including the fact that PII can be bought and sold at identifiable prices on established markets." *Smallman v. MGM Resorts Int'l,* 638 F. Supp. 3d 1175, 1191 (D. Nev. 2022).

At this stage, taking Plaintiffs' allegations as true and drawing all reasonable inferences therefrom, Plaintiffs have plausibly alleged standing based on diminution of value of their Private Information.

### 7. Emotional Distress is an Injury-In-Fact.

Plaintiffs have alleged concrete harm in the form of stress and anxiety because of their Private Information being disclosed to the exact people the cybersecurity measures were supposed to protect them from. Although the court in *Beck* rejected "emotional upset" and "fear [of] identity theft and financial fraud" as sufficient to confer Article III standing, four months later, the Fourth Circuit reversed course and found a concrete injury-in-fact where the plaintiff "'suffered and continues to suffer' actually existing intangible harms that affect her personally: 'emotional distress, anger, and frustration.' [plaintiff] thus sufficiently established the existence of an injury in fact." *Ben-Davies v. Blibaum & Assocs., P.A.*, 695 F. App'x 674, 676–77 (4th Cir. 2017) (per curiam). Contrary to Defendant's suggestion, the Fourth Circuit has not forbidden emotional distress as a basis for standing; such allegations simply must meet the same threshold requirements as any other basis for standing—whether Plaintiffs have specific allegations to support their contention they suffered a concrete intangible harm with a close relationship to traditionally recognized harms. *C.f. Brown v. Alltran Fin., LP*, 2022 WL 377001, at *4–5 (M.D.N.C. Feb. 8, 2022). ("The question is whether the complaint includes allegations that [plaintiff] suffered harms with a 'close relationship' to the harms caused by those or other traditional torts . . . As noted

*supra*, standing is not a generic analysis. [Plaintiff] has not identified any specific allegations to support its contention that Ms. Brown alleged a concrete intangible harm.") (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431-435 (2021); *Ben-Davies*, 695 F. App'x at 676–66).

Thus, because Plaintiffs here have suffered stress and anxiety due to their PII falling into the hands of the cybercriminals they were supposed to be protected from, they have alleged emotional harm as an independent concrete injury.

### 8. Plaintiffs Have Standing to Pursue Injunctive Relief.

Finally, Defendant argues that injunctive relief "must be to prevent harm stemming from the incident that already occurred and is the subject of this litigation. It cannot be designed to prevent a future incident." Mot. at 10. As a result, Defendant maintains that injunctive relief "must relate to '*this* data breach' and cannot be designed to prevent a future one." *Id.* Defendant is mistaken. As the Supreme Court has explained, a "person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435 (citing *Clapper*, 568 U.S. at 414 n.5).

In the data breach context, courts routinely find that plaintiffs have standing to pursue injunctive relief requiring defendants to implement adequate cybersecurity measures to protect the data entrusted to it against a future data breach. *See e.g.*, *Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 881–82 (N.D. Cal. 2024); *In re Ambry Genetics Data Breach Litig.,* 567 F. Supp. 3d 1130, 1141 (C.D. Cal. 2021) (holding that plaintiffs had standing for injunctive relief when defendants "announced few if any changes to their data security infrastructure . . . which permitted the breach to occur" and plaintiffs alleged "now that Defendants' insufficient data security is known to hackers, [plaintiff's information] is even more vulnerable to cyberattack"); *In re Fortra File*

*Transfer Software Data Sec. Breach Litig.*, 749 F. Supp. 3d 1240, 1262 (S.D. Fla. 2024) (holding that plaintiffs had standing to sue for injunctive relief because "the requested injunctive relief arises from the allegation that Defendants still possess Plaintiffs' PII/PHI and their data security measures remain inadequate").

Plaintiffs have alleged that Defendant's actions were—and still are—inadequate and unreasonable, Compl. ¶ 295, and Defendant is still in possession of their sensitive and confidential records, *see e.g.*, *id.* ¶ 264. As a result, Plaintiffs have standing to pursue injunctive relief.

### C. Plaintiffs State a Claim Pursuant to Rule 12(b)(6)

Under Rule 12(b)(6), a complaint should be dismissed only if the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). And the Court must "draw all reasonable inferences in favor of the plaintiff[,]" when evaluating a 12(b)(6) motion. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).[4]

### 1. Plaintiffs Plausibly Allege Their Negligence Claim.

Defendant challenges Plaintiffs' negligence claim, arguing that Plaintiffs' alleged damages are "entirely speculative." (ECF No. 25, p. 12). Not so. This Court recently considered – and denied – a similar argument in *Capiau v. Ascendum Machinery, Inc.*, 2024 WL 3747191, at *9, explaining:

> As discussed in the above standing analysis, Plaintiff alleges damages stemming from: [1] actual mis-use of their PIIl; (2) an intangible harm fairly analogous to common law invasion of privacy; (3) the substantial risk that Plaintiff's PII will continue to be mis-used in the future; and (4) opportunity and other costs imposed by reasonable mitigation efforts intended to address the substantial risk of PII mis-use.

---

[4] Plaintiffs do not dispute that North Carolina law should be applied at this early stage. *See Farley*, 2023 WL 1353558, at *5; *Capiau*, 2024 WL 3747191, at *9. In the data breach context, North Carolina courts apply the law of the state where the data breach occurred, *i.e.*, the company's headquarters, generally. *See Lamie v. Lendingtree, LLC*, 2023 WL 1868198, at *2 (W.D.N.C. Feb. 9, 2023) (applying North Carolina law because it was "the situs of Defendant's headquarters and principal place of business"); *Farley*, 2023 WL 1353558, at *5 (same).

*Id.* The same holds true in this case: Plaintiffs' allegations of damages caused by the Defendant (as outlined above) are sufficient to survive Defendant's 12(b)(6) motion. *See id.*

Although "bare assertions of emotional injury" are not sufficient to establish a cognizable damage, plaintiffs may still recover for emotional distress when such emotional distress is coupled with other cognizable damages. *See id.* at *7. Here, none of Plaintiffs' claims rely exclusively on an emotional distress injury and, as discussed above, Plaintiffs have plausibly alleged multiple forms of injury. Therefore, this argument does not require dismissal of any claims.

### 2. Plaintiffs Plausibly Allege Their Negligence *Per Se* Claim.

Under North Carolina law, a plaintiff may bring a claim for negligence *per se* by showing that (1) the defendant violated a "public safety statute" that imposed upon the defendant "a specific duty for the protection of others," (2) the plaintiff was a member of the class of persons the statute intended to protect, and (3) the plaintiff suffered harm due to the defendant's violation. *Capiau*, 2024 WL 3747191, at *10 (quoting *Stein v. Asheville City Bd. Of Educ.*, 360 N.C. 321, 326 (2006)) (cleaned up). Plaintiffs plausibly set forth each of these elements and Defendant's assertion that Plaintiff did not allege damages is again unpersuasive. *See Capiau*, 2024 WL 3747191, at *10 (finding "[t]hat argument fails for the same reasons discussed in the foregoing section.").

Defendant also incorrectly argues that Plaintiffs' negligence *per se* claim must fail because Section 5 of the Federal Trade Commission Act ("FCT Act"), 15 U.S.C. § 45 and the Health Insurance Portability and Accountability Act ("HIPAA") do not provide private rights of action. Mot. at 13. However, this Court has already rejected such arguments, stating:

> Plaintiff does not need a cause of action under the FTC Act to sue for negligence because negligence <u>is itself</u> the cause of action. The elements of a negligence claim are duty, breach, causation, and damages. On a "garden variety" negligence claim, the duty element is defined by the "ordinary care" standard. Negligence per se, however, is a unique subspecies of negligence. To bring a claim of negligence per se, the plaintiff must allege that the defendant violated a statute, and that violation

of the statute caused the plaintiff to suffer damages. With respect to the duty element, "[t]he common law rule of ordinary care does not apply—" instead, "the statute prescribes the standard" of care. *Parker v. Colson*, 266 N.C. App. 182, 186, 831 S.E.2d 102 (2019) (quoting *Carr v. Murrows Transfer, Inc.*, 262 N.C. 550, 554, 138 S.E.2d 228 (1964)). Contrary to Defendant's apparent misunderstanding, Plaintiff does not sue for negligence per se under the FTC Act, but instead argues that the Act provides the standard of care against which Plaintiff's negligence per se claim should be assessed.

*Capiau*, 2024 WL 3747191, at \*10. Both the FTC Act and HIPAA qualify as "public safety statutes" that impose upon Defendant "a specific duty for the protection of others."[5] The FTC Act imposes upon Defendant, a regulated business, a duty to avoid "unfair or deceptive acts or practices in commerce." *Id.* (quoting 15 U.S.C. § 45). *See* Compl, ¶¶ 178–182. Similarly, HIPAA imposes upon Defendant a duty to implement reasonable security provisions to keep medial information safe. *Id.* at ¶¶ 188–189, 231. Despite this, Defendant breached its duties, resulting in the Data Breach. *Id.* at ¶¶ 183, 190–191, 226–227, 232.

Finally, Plaintiffs have plausibly alleged that they are members of the classes of people that the FTC Act and HIPAA exist to protect. "[W]hen an employee exchanges their labor and PII for employment compensation, they are undoubtedly engaged in commerce and therefore protected by the FTC Act." *Capiau*, 2024 WL 3747191, at \*10. Here, Plaintiffs are current or former employees of Defendant, and, in exchanging their labor and PII for employment, they undoubtedly engaged in commerce protected by the FTC Act. Compl. ¶¶ 24, 41, 44, 59–60, 71,

---

[5] Indeed, courts regularly rely on the FTC Act and HIPAA to establish negligence *per se* claims. *See e.g.*, *In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cases P 79708, 2016 WL 4128215, at \*32 (MSNET July 28, 2016) (comparing HIPAA's requirements to the FTC Act's requirements, and concluding "that LabMD's data security practices were unreasonable and constitute an unfair and deceptive trade practice in violation of Section 5 of the FTC Act."); *In re Marriott Int'l,* 440 F. Supp. 3d at 479; *In re Equifax, Inc.*, 362 F. Supp. 3d 1295, 1327 (N.D. Ga. 2019) ("failure to maintain reasonable and appropriate data security for consumers' sensitive personal information can constitute an unfair method of competition in commerce in violation of the [FTC] Act."); *In re Ambry Genetics*, 567 F. Supp. 3d at 1142–43 (HIPAA); *Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. 3d 1360, 1373 (N.D. Ga. 2021) (HIPAA and FTC Act).

74, 89–90, 103, 112, 115, 130, 133, 149, 155, 228. In that same vein, Defendant chose to maintain Plaintiffs' confidential medical information governed by HIPAA. *Id.* at ¶¶ 3, 190-191 *See also id.* at ¶¶ 190–191. Plaintiffs and their confidential medical information are the precise group of people and information that HIPAA seeks to protect.

### 3. Plaintiffs have Stated a Claim for Breach of Implied Contract

Defendant next argues that Plaintiffs have failed to demonstrate a mutual understanding that Defendant was obligated to safeguard their Private Information. Mot. at 14. However, courts within the Fourth Circuit and elsewhere recognize that the promise to safeguard PII is inherent to any transaction in which one is required to entrust confidential information to another. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 466 (D. Md. 2020) ("it is enough to allege that there was an explicit or implicit contract for data security, that plaintiffs placed value on that data security, and that Defendants failed to meet their representations about data security"). Pertinent here, "[w]hen an employer requires an employee to submit their sensitive personal information, the employee therefore has a reasonable expectation that the employer will take reasonable care not to place their personal data at unnecessary risk of exposure." *In re Waste Mgmt. Data Breach Litig.*, 2022 WL 561734, at *4 (S.D.N.Y. Feb. 24, 2022); *see also Perry v. Bay & Bay Transportation Servs., Inc.,* 650 F. Supp. 3d 743, 757 (D. Minn. 2023) ("Bay & Bay provided consideration by promising to consider Perry for employment, while Perry provided consideration by providing valuable property, her PI. By mandating this exchange of information, it is plausible that Bay & Bay made an implied promise to keep the PI secure.").

Plaintiffs have additionally alleged that Defendant's published privacy policy promises that "Bojangles has security policies and practices in place designed to protect your Personal Information against unauthorized access or disclosure, theft, misuse, and loss" and that "[w]e make

commercially reasonable efforts for secure handling of this information." Compl. ¶ 25. Courts regularly find commitments to safeguard personal information in privacy policies sufficient to show a defendant's mutual intent to maintain Private Information as confidential. *Sackin v. Transperfect Glob., Inc.,* 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017) ("TransPerfect's privacy policies and security practices manual [] further supports a finding of an implicit promise"); *In re Arthur J. Gallagher Data Breach Litig.*, 631 F. Supp. 3d 573, 591 (N.D. Ill. 2022) (same). And to the extent Defendant argues that Plaintiffs' damages are speculative, Plaintiffs have addressed this argument, *supra*.

### 4. Invasion of Privacy

Defendant does little more than recite the legal standard and conclude, without analysis or support, that Plaintiffs have failed to state a claim for invasion of privacy. North Carolina law recognizes invasion of privacy claims via intrusion upon seclusion when there is an intentional intrusion, "'physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . [where] the intrusion would be highly offensive to a reasonable person.'" *Miller v. Brooks*, 123 N.C. App. 20, 26-27, 472 S.E.2d 350, 354 (1996) citation omitted.

North Carolina courts have recognized a diverse array of facts as giving rise to invasion of privacy claims including "physically invading a person's home or other private place, eavesdropping by wiretapping or microphones, peering through windows, persistent telephoning, unauthorized prying into a bank account, and opening personal mail of another." *Hall v. Post*, 85 N.C. App. 610, 615, 355 S.E.2d 819, 823 (1987), *reversed on other grounds*, 323 N.C. 259, 372 S.E.2d 711 (1988).

Most analogously, perhaps, the North Carolina Court of Appeals recognized such claims when "defendants intentionally obtained information from [plaintiff's] state personnel file and

gave it to unauthorized individuals." *Toomer v. Garrett*, 574 S.E.2d 76, 90 (2002). The court concluded that "unauthorized examination of the contents of one's personnel file, especially where it includes sensitive information such as medical diagnoses and financial information… would be highly offensive to a reasonable person" and reversed the trial court's dismissal of this claim. *Id*.

Here, Defendant, through its negligence and inattention to information security, allowed criminal actors to access Plaintiffs' Private Information. Compl. ¶28. Clearly, this intrusion upon the private affairs of Plaintiffs is highly offensive to a reasonable person.

While some courts have distinguished *Toomer* based on its focus upon examination of the contents of the disclosure, rather than the public disclosure itself, such a distinction would not save Defendant here. *See, e.g., Weddle v. WakeMed Health*, 2023 WL 8369786, at *5 (NCBC Dec. 4, 2023) (dismissing invasion of privacy claim where no examination of private information was found). In the instant action Plaintiffs have fully documented how their information was posted on the dark web for examination and exfiltration by malicious actors. Compl. ¶37-40. Defendant cannot escape liability for this.

### 5. Plaintiffs Have Stated a Claim for Unjust Enrichment

Defendant next argues that Plaintiffs have not alleged sufficient facts to support their claim for unjust enrichment. However, Plaintiffs have alleged that Defendant diverted funds intended for data security to its own profit and was thus unjustly enriched. Compl. ¶¶ 271-72. These are precisely the allegations upon which courts find an unjust enrichment in data breach cases. *Sackin*, 278 F. Supp. 3d at 751 ("it would be inequitable and unconscionable to allow TransPerfect to retain the money it saved by shirking data-security, while leaving Plaintiffs to suffer the consequences.") (quoting *Castillo v. Seagate Tech., LLC*, No. 16-CV-01958-RS, 2016 WL 9280242, at *9 (N.D. Cal. Sept. 14, 2016)). Indeed, courts regularly find that a failure to adequately

fund data security satisfies the elements of unjust enrichment:

> courts have concluded that the failure to secure a party's data can give rise to an unjust enrichment claim where a defendant accepts the benefits accompanying a plaintiff's data and does so at the plaintiff's expense by not implementing adequate safeguards, thereby making it 'inequitable and unconscionable' to permit defendant to retain the benefit of the data (and any benefits received therefrom), while leaving the plaintiff party to live with the consequences.

*In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 412 (E.D. Va. 2020); *see also Bowen v. Paxton Media Grp., LLC*, No. 5:21-CV-00143-GNS, 2022 WL 4110319, at *8 (W.D. Ky. Sept. 8, 2022) ("Plaintiffs allege that '[b]y engaging in the acts and failures to act described in this Complaint, Defendant has been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII of Plaintiffs and the Class.' At this stage in the litigation, Plaintiffs have sufficiently pleaded facts from which a reasonable jury could infer that Defendant received a benefit at the expense of the Plaintiffs 'without payment for its value.'"). For the same reasons, under the circumstances here, the unjust enrichment claim is properly pled.

### 6. Breach Of Fiduciary Duty Claims

Defendant incorrectly asserts that Plaintiffs have failed to state a claim for breach of fiduciary duty. However, Defendant's characterization of Plaintiffs' claims is inaccurate, and their reliance on *Curry v. Schletter Inc.* is misplaced given the unique circumstances alleged in this case.

Under North Carolina law, a fiduciary relationship exists "whenever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *White v. Consolidated Planning, Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004). While the general rule is that an employer-employee relationship does not automatically create a fiduciary duty, *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 708 (2001), North Carolina courts recognize that fiduciary duties may arise where

a special relationship of trust and confidence exists beyond the ordinary employment relationship.

Unlike in *Curry*, where the plaintiffs merely alleged that the defendant was a fiduciary "in matters connected with their employment" without further elaboration, *Curry v. Schletter Inc.*, No. 1:17-cv-0001-MR-DLH, 2018 WL 1472485, at *5 (W.D.N.C. Mar. 26, 2018), Plaintiffs here have alleged specific facts demonstrating that Bojangles occupied a position of special trust and confidence with respect to their Private Information.

Specifically, Plaintiffs allege that Bojangles, as their employer, "required that Plaintiffs hand over their PII—in exchange for receiving employment from Defendant" (Compl. ¶ 39), including highly sensitive personal and health information such as Social Security numbers, driver's license numbers, and health insurance information (Compl. ¶ 28). Bojangles collected and maintained this information for its own business purposes, and Plaintiffs had no choice but to provide this information as a condition of their employment (Compl. ¶¶ 49-50). The relationship here goes beyond a typical employer-employee relationship because Bojangles assumed a position of trust with respect to Plaintiffs' most sensitive personal information.

The court in *Curry* deliberately chose not to slam the door on the possibility of a fiduciary relationship between an employer and their employees and it is for the very reason raised by the facts presented by the Plaintiffs here. An employer takes on a special duty – a heightened duty – that is fiduciary in nature when it collects particularly sensitive information from employees. Courts in North Carolina have recognized the importance of protecting that information. In *Allen v. Novant Health, Inc.*, the court denied a motion to dismiss a breach of fiduciary duty claim where the plaintiff alleged that the defendant had breached its duty to protect the plaintiff's personal information. No. 1:22-CV-697, 2023 WL 5486240, at *14-15 (M.D.N.C. Aug. 24, 2023). Similarly, in *Farley*, the court allowed a breach of fiduciary duty claim to proceed past the motion to dismiss

stage. 2023 WL 1353558 at *4.

Plaintiffs have adequately alleged the existence of a fiduciary relationship and stated a plausible claim for breach of fiduciary duty.

### 7. UDTPA Claims

Defendant's motion to dismiss Plaintiffs' claims under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") should be denied because Plaintiffs adequately alleged that Defendant engaged in unfair and deceptive trade practices "in or affecting commerce."

#### a. *Plaintiffs Have Adequately Alleged Unfair and Deceptive Acts and Practices*

Under the UDTPA, it is unlawful to engage in "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). To state a claim under the UDTPA, a plaintiff must allege that: (1) the defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

Plaintiffs have adequately alleged that Defendant committed unfair and deceptive acts or practices by: (1) collecting sensitive personal and health information from Plaintiffs (Compl. ¶¶ 49-50); (2) failing to implement adequate security measures to protect that information (*Id.* ¶ 69); (3) failing to adhere to industry standards and best practices for data security (*id.* ¶¶ 57-65); (4) failing to comply with applicable laws and regulations (*id.* ¶¶ 149-54); and (5) failing to provide timely and adequate notice of the data breach (*id.* ¶¶ 70-71).

Courts have recognized that inadequate data security practices can constitute unfair or deceptive acts or practices. *See In re Equifax, Inc.*, 362 F. Supp. 3d 1295, 1327 (N.D. Ga. 2019) ("[F]ailure to maintain reasonable and appropriate data security for consumers' sensitive personal information can constitute an unfair method of competition in commerce."); *Weddle v. WakeMed*

*Health and Hospitals*, 2023 NCBC 82, 2023 WL 8369786, at *19-20 (N.C. Super. Dec. 4, 2023).

### b. The Alleged Unfair and Deceptive Acts Were "In or Affecting Commerce"

Defendant argues that Plaintiffs' UDTPA claims should be dismissed because they arose within the context of an employer-employee relationship, which they contend falls outside the scope of "commerce" under the UDTPA. This argument mischaracterizes both the nature of Plaintiffs' claims and the applicable law.

While the UDTPA excludes "professional services rendered by a member of a learned profession" from its definition of commerce, N.C. Gen. Stat. § 75-1.1(b), this exemption is narrowly construed. *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 334, 828 S.E.2d 467, 473 (2019). The employer-employee relationship is not categorically excluded from the UDTPA's coverage. Rather, the analysis turns on whether the alleged unfair or deceptive acts occurred within the employer-employee relationship itself or in a broader commercial context.

Here, Plaintiffs' claims do not arise from the rendering of any professional service but from Defendant's alleged failure to implement adequate data security measures and to timely notify affected individuals of the data breach. These alleged failures affect not only the specific employer-employee relationship but also the broader marketplace. Moreover, the commercial nature of Defendant's data security practices is underscored by the fact that these practices are part of Bojangles' overall business operations. The collection and maintenance of personal and health information is an integral part of Bojangles' commercial activities (Compl. ¶¶ 29-31).

In *Curry v. Schletter Inc.*, the court denied a motion to dismiss UDTPA claims arising from a data breach in the employment context, finding that the plaintiffs had sufficiently alleged that the defendant's actions constituted unfair or deceptive trade practices in or affecting commerce. 2018 WL 1472485, at *5-6. The facts alleged here are materially indistinguishable from those in *Curry*.

### c. *Plaintiffs Have Adequately Alleged Violations of the NCITPA, Which Constitute Per Se Violations of the UDTPA*

Plaintiffs have adequately alleged violations of the North Carolina Identity Theft Protection Act ("NCITPA"), which constitute per se violations of the UDTPA. The NCITPA expressly provides that a violation of N.C. Gen. Stat. § 75-62 is also a violation of the UDTPA. *See* N.C. Gen. Stat. § 75-62(d). Plaintiffs have alleged that Defendant violated § 75-62(a)(1) by intentionally communicating their Social Security numbers to the general public and § 75-62(a)(6) by intentionally disclosing their Social Security numbers to a third party without written consent (Compl. ¶¶ 149-54). As the court in *Curry* noted, a plaintiff states a viable claim under § 75-62(a)(1) by alleging that the defendant "communicat[ed] the Plaintiffs' Social Security numbers to an unknown cybercriminal, thereby rendering the Plaintiffs' otherwise protected and secure information completely unprotected and non-secure." *Curry*, 2018 WL 1472485, at *5. Plaintiffs have made precisely these allegations here. Moreover, the NCITPA's exception for "internal verification or administrative purposes" is an affirmative defense that "requires development of the factual record and thus cannot be resolved at the Rule 12(b)(6) stage." *Id*. at *6.

For these reasons, Plaintiffs have adequately stated claims under the UDTPA, and Defendant's motion to dismiss these claims should be denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Class Action Complaint should be denied in its entirety. Should the Court find dismissal of any portions of Plaintiffs' claims warranted, Plaintiffs respectfully request leave to amend the Complaint to address any deficiency identified by the Court.

Dated: April 29, 2025  Respectfully submitted,

By: */s/ Scott C. Harris*_____
Scott C. Harris
N.C. State Bar No. 35328
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
919-600-5000
Fax: 919-600-5035
sharris@milberg.com

Raina C Borrelli (admitted *pro hac vice*)
**STRAUSS BORRELLI PLLC**
980 N Michigan Ave.
Suite 1610
Chicago, IL 60611
872-263-1100
Fax: 872-263-1109
raina@straussborrelli.com

William B. Federman (admitted *pro hac vice*)
Jessica A. Wilkes (admitted *pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave
Oklahoma City, OK 73120
405-235-1560
Fax: 405-239-2112
jaw@federmanlaw.com
wbf@federmanlaw.com
Marc H. Edelson
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
T: (215) 867-2399
medelson@edelson-law.com

Jeff Ostrow*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Ft. Lauderdale, FL 33301
T: (954) 525-4100
ostrow@kolawyers.com

26

Nicholas A. Migliaccio*
Jason Rathod*
**MIGLIACCIO & RATHOD LLP**
412 H Street NE
Washington, D.C. 20002
Tel: (202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

J. Gerard Stranch, IV*
Grayson Wells*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Terence R. Coates*
Spencer D. Campbell*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, OH 45202
Phone: (513) 651-3700
Fax: (513) 665-0219
tcoates@msdlegal.com
scampbell@msdlegal.com

*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs and the Putative Class*

27

Case 3:25-cv-00065-KDB-DCK     Document 32     Filed 04/29/25     Page 27 of 29

**<u>Artificial Intelligence Certification</u>**

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, I hereby certify that:

o No artificial intelligence was employed in doing the legal research for the preparation of this document, with the exception of such artificial intelligence embedded in standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

o Every statement and every citation to an authority contained in this document has been checked by an attorney at this firm and/or paralegal working at their direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This 29th day of April, 2025.

<u>/s/ Scott C. Harris</u>
Scott C. Harris

28

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2025 the foregoing was filed electronically using CM/ECF, which delivered electronic service of same to all counsel of record.

/s/ Scott C. Harris
Scott C. Harris

29